WRIGHT (MOTT v.).　See Case No. 9,883.

WRIGHT (NICHOLLS v.).　See Case No. 10,-236.

## Case No. 18,086.

WRIGHT et al. v. NORWICH & N. Y. TRANSP. CO.

[1 Ben. 156.] [1]

District Court, D. Connecticut. May, 1867.[2]

COLLISION—LIMITATION OF LIABILITY—PROCEEDINGS TO APPORTION LIABILITY—JURISDICTION OF DISTRICT COURT.

1. Where, in a collision between a steamer and a schooner, both vessels were sunk, and the steamer was afterwards raised and repaired, and this suit was brought by the owners of the schooner against the owners of the steamer, in which a decree was rendered for the libellants, with an order of reference to a commissioner to ascertain the damage, and his report, fixing such damage, was confirmed by the court. And where the respondents, thereupon, applied to the court on motion to reserve the final decree, that they might take "appropriate proceedings" to apportion the sum for which they might be liable among the parties entitled thereto, under the provisions of the act of congress of March 3, 1851 [9 Stat. 635], offering to the court proof of the value of their vessel and her freight, and that such value was exceeded by the amount of the claims for property destroyed in the collision. Held, that the liability of owners of vessels for damages done by their own to other craft in cases of collision, is limited by the third section of the act to the amount and value of their interest in the vessel at fault and her pending freight.

2. This limitation of liability is not confined to damages done to property on board the faulty vessel, but embraces all damages.

3. The respondents are, under the circumstances of this case, entitled, by the fourth section of the act, to take proceedings to have the amount for which they are liable apportioned among the parties entitled to it.

4. But that this court has no power to give them such relief in any form of proceeding. That power does not belong to its jurisdiction in admiralty, certainly not in a suit in personam, where neither the faulty ship and freight, nor their amount or value, is within the control of the court, and where the court can render no judgment that will bind parties not before it, and cannot make parties of such as reside and remain out of the district. And the court has no equity powers adequate to granting such relief.

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]
[2] [Affirmed in Case No. 18,087. Decree of circuit court affirmed by supreme court in 13 Wall. (80 U. S.) 104.]

5. The evidence must be rejected and the motion denied; and as the value of the steamer and her freight, at the time of the collision, was greater than the amount of the report, the libellants must have a decree for that amount.

In admiralty.

SHIPMAN, District Judge. On the 18th of April, 1866, the schooner S. Van Vliet, owned by the libellants [W. A. Wright and others], and the steamboat City of Norwich, owned by the respondents, collided in Long Island Sound. The collision sunk the schooner, and both she and her cargo were lost. The steamboat was greatly damaged by the blow, and soon after took fire and sunk. She had on board a valuable cargo, which was lost. The steamer was subsequently raised and repaired at great expense.

A libel in personam against the owners of the steamboat was filed in this court, and after answer and full hearing, she was held in fault, and a decree entered against her owners, with an order of reference to a commissioner to compute the damages to the owners, both of the schooner and her cargo, and report the same to the court. The commissioner heard the parties and made a special report. Upon motion that the court confirm the report, counsel were heard upon the questions of law raised pertaining to that branch of the case. The report was confirmed upon principles set forth in the opinion of the court, and the damages of the owners of the schooner were fixed at $19,975, and those of the owners of the cargo at $1,921.13.

Thus far the case presented only the ordinary features of a suit for collision, and was free from all embarrassing questions. If nothing further now appeared, the libellants would be entitled to a decree against the respondents for the full amount of the above damages.

At this point, however, the respondents move the court to reserve the final decree, that they may "take appropriate proceedings," and offer evidence to this court "for the purpose of apportioning the sum for which the owners of the steamboat may be liable, among the parties entitled thereto." The object of the respondents is to avail themselves of the benefits of the provisions of the act of congress of March 3, 1851, limiting the liability of ship owners for the consequences of the torts of the master and others on board. The respondents insist that they have laid the foundation for this proceeding in their answer, by averring that the damages resulting from this collision to third parties greatly exceed the value of their boat and her freight then pending. No formal steps have been taken by way of presenting evidence to this court of the amount of the claims of those whose property was on board of the faulty boat, and was injured or destroyed by her taking fire and sinking, but, upon suggestion of the

court, and by consent of counsel, such evidence was considered as offered under this motion and objected to, and the general question of the right of the respondents to relief, and the power of the court to grant it, was argued at length.

The points discussed at bar may be condensed into the following questions: (1) How far the original liability of ship owners for the faults of their vessels in cases of collision is limited by the act of March, 1851? (2) What relief the respondents are entitled to under that act? (3) How far this court can grant such relief as the act intended to provide?

I see no reason to doubt that the liability of owners of vessels for damages done by their own to other craft in cases of collision, is limited by this act to the amount and value of their interest in the vessel at fault, and her pending freight. The third section of the act is too explicit to be explained away by any comparison of its provisions with the history of British legislation on the same general subject. The direct language of this section coincides with the plain and well known object of the whole statute, which was to encourage commercial enterprises in the building and sailing of ships, by relieving the owners from any liability for losses beyond the value of their interest in the vessel and freight pending. The argument of the libellants' counsel is that the liability limited by the act, so far as it relates to collision, is confined to damages done to property on board the faulty vessel— in other words, that the sole object of congress, was to relieve the owners whose vessel may be in fault, from the unlimited liability to which they would otherwise be held as common carriers. The attempt is made to support this construction by arguments drawn from the history of the various English acts on this subject, and by a comparison of the language of those acts with that of our own. But, as already intimated, I regard this section as too explicit to admit of any such construction. It would not be plainer if the other words were left out, and it read simply "the liability of the owner or owners of any ship or vessel * * * for any loss, damage, or injury by collision * * * without the privity of such owner or owners, shall in no case exceed the amount or value of the interest of such owner or owners respectively, in such ship or vessel and her freight then pending."

The reasons for limiting the liability for injuries resulting to other vessels and their cargoes are just as weighty as those for limiting it for injuries done to the cargoes of the vessels in fault. Collisions are frequent, their hazards great, and the injuries inflicted upon other vessels and cargoes often far exceed the value of the faulty ship and her pending freight. The disaster out of which this controversy has sprung, presents an instructive lesson on this point.

Had the libellants' vessel been condemned as in the wrong, her owners, according to their present argument, would have been liable for the whole amount of damages done to the city of Norwich and her cargo, exceeding by many times over the amount or value of their interest in the Van Vliet. The owners of the latter would not only have lost their vessel and her pending freight, amounting to over $20,000, but would have been responsible to other parties for probably $100,000 more. It was against just such calamities, out of all proportion to the magnitude of the capital invested, that I understand this act to provide. I apprehend that this construction of the third section of this act would never have been doubted, but for the singular provisions of the fourth section. But I do not think they seriously affect the question.

This brings us to the consideration of our second point—what relief the respondents are entitled to under this act. They have alleged in their answer, and now offer to prove, that the injuries resulting from this collision, including not only those which these libellants are seeking indemnity for, but also those suffered by owners of property on board the City of Norwich, greatly exceeded in amount or value their interest in the latter boat and her freight then pending. They propose to prove her value, and the value of her freight, and the extent of the losses to the owners of the property on board, in order to enable the court to apportion the sum for which the owners of the boat are liable, among the parties entitled thereto, to wit: these libellants and the owners of goods destroyed on the respondents' boat. This, they claim, they are authorized to do by the fourth section of the act in question, which is as follows: "If any such embezzlement, loss, or destruction shall be suffered by several freighters or owners of goods, wares, or merchandise, or any property whatever, on the same voyage, and the whole value of the vessel and her freight for the voyage shall not be sufficient to make compensation to each of them, they shall receive compensation from the owners of the ship or vessel in proportion to their respective losses; and for that purpose, the said freighters and owners of the property, and the owner or owners of the ship or vessel, or any of them, may take the appropriate proceedings in any court, for the purpose of apportioning the sum, for which the owner or owners of the ship or vessel may be liable, among the parties entitled thereto. And it shall be deemed a sufficient compliance with the requirements of this act on the part of such owner or owners, if he or they shall transfer his or their interests in such vessel or freight, for the benefit of such claimants, to a trustee to be appointed by any court of competent jurisdiction, to act as such trustee for the person or persons who may prove to be entitled thereto; from and after which transfer all claims and proceedings against the owner or owners shall cease."

It was undoubtedly foreseen by congress, that in cases of embezzlement and kindred torts, and in cases of collision, there would arise instances where several different parties would have claims for damages against the owners of a vessel, exceeding her value in the aggregate, and would very likely endeavor to enforce them in separate suits and in different tribunals, and in order to protect the interest of all parties, it was necessary that there should be some way provided by which the amount to which the liability of the owner is limited, should be distributed among those entitled to recover, in proportion to their respective claims. This state of things would exist, or at least might exist, whenever property on board either one or both colliding vessels, belonging to parties other than such owners, was destroyed or injured, and the whole amount of damage should exceed the value of the faulty vessel and her pending freight. Indeed, it might occur where one vessel strikes two others in the same collision, as has more than once happened, and the owners of each injured vessel should bring a separate suit. The language of this fourth section is, therefore, very broad, and extends the power of taking proceedings for an apportionment to the owner of the faulty vessel, and to the several owners or freighters of any property whatever lost or destroyed by the tortious act of those on board. Whenever, therefore, there are several claimants for damages arising out of the same tortious act, who have brought, or may be entitled to bring, separate suits, the necessity for apportioning the amount, for which the owners of the vessel in fault are liable, arises. The respondents in the present suit find themselves in that condition. In addition to the claims of these libellants, upon which large damages have been awarded against them, they are liable, assuming the judgment of this court as to the cause of the collision to be correct, to freighters or owners of goods on the City of Norwich for a much larger amount; and they aver that the whole sum for which they are thus liable exceeds the value of their interest in their boat and pending freight at the moment preceding the collision. They are entitled therefore to take proceedings to have the amount, for which they are liable, apportioned among the parties entitled thereto. This is one species of relief which the act intended to provide. The other, the transfer of the ship and freight to a trustee, they have not resorted to, and therefore nothing need be said on that subject.

Just here we enter upon the most embarrassing questions which arise under this act. The power given to parties, to protect their

rights by an apportionment of the sum for which the owners of the vessel are liable, is expressed in vague and uncertain terms, both as to the nature of the proceedings to be taken, and the court which is to administer them. We are, therefore, brought to the consideration of our last question, how far this court can grant the relief which this act intended to provide. The language of the act is, that the parties authorized, or any one of them, "may take the appropriate proceedings in any court for the purpose of apportioning the sum," &c. What is here meant by "appropriate proceedings?" It is reasonable to suppose that congress, by this language, referred to some course of legal procedure already known to the law, and administered by some distinct tribunal, according to a settled practice. As this act was framed with full knowledge of the various English acts, relating to the same subject, and was intended to accomplish substantially the same result, we may infer that the appropriate proceedings contemplated were substantially such as have been employed in the enforcement of the English act. These were equity proceedings, administered by the high court of chancery. That tribunal was empowered to entertain suits of this character, and to draw the whole controversy within its jurisdiction, by stopping actions in all other courts relating to the same subject matter. The most ample powers were conferred on that court to enable it to make a complete, effectual, and final disposition of the litigation, so as to bind all parties in interest. These powers were transferred to the high court of admiralty in 1861. (See Judge Benedict's opinion in the case of Place v. The City of Norwich [Case No. 11,-202]. Some such powers as those exercised by the English courts must be possessed and employed by whatever tribunal effectually administers this act of congress. It must be able, by a binding decree, to settle the whole controversy, and conclude the parties in interest. Now our present inquiry is, whether this court possesses powers commensurate with such a task. Waiving now the question whether, if it had the power at all, it could proceed to exercise it in connection with, and as a part of, the present suit, I pass to the inquiry whether it can do so under any form of proceeding, unless its jurisdiction is first enlarged. It is true that this section says that the parties, or any of them, "may take the appropriate proceedings, in any court for the purpose of apportioning, &c." Of course these words, "any court," are not to be taken in their literal sense. From necessity we must restrict and qualify them at the start. A court whose jurisdiction is exclusively criminal, cannot be deemed within their meaning. No one will doubt that civil as distinguished from criminal tribunals, alone were indicated. Nor can we suppose for a moment that it was

intended by this act to authorize a resort to all civil courts. Tribunals of limited and inferior jurisdiction, like probate, surrogate, or local city courts, are not within the meaning of these words, although within their literal expression. They undoubtedly refer, as the latter clause of this section, when providing for the transfer of the vessel to a trustee, designates, to courts of competent jurisdiction,—tribunals having a range of authority and a mode of procedure adequate, or at least adapted to accomplish the purposes the act had in view. Now, the only courts of a character at all resembling this description, are courts possessing a general equity jurisdiction. Whether even such courts, as constituted in this country, are, without the aid of special legislation, adequate to this task, I do not now stop to inquire. Nor do I pause to ask the question whether the equitable jurisdiction of any other court of the United States, as the law now stands, is equal to the work. It is sufficient for me here, to determine whether this court has any such power. I answer unhesitatingly, that it has not. It does not pertain to its jurisdiction in admiralty; certainly not in a suit in personam, where neither the faulty ship and freight, nor their amount or value, are within the control of the court. In a suit in personam, it can render no judgment that would bind parties not before it. None of these freighters are parties to this suit, and it is doubtful if this court has power to make them parties. Certainly, it has no power to make parties of such as reside and remain beyond the limits of this district.

It is hardly necessary to add that this court has no equity powers adequate to the exercise of the duty supposed to be conferred upon some court by this section of the act. Its jurisdiction depends upon the acts of congress, and with the exception of a single subject matter, no equity jurisdiction has ever been conferred upon it. I presume it will hardly be contended that, because congress has authorized, in terms, appropriate proceedings to be taken in any court, it has, by implication, conferred upon every court powers adequate to the work of effectually administering this act. And if it has not, this court is without jurisdiction, without rules of practice, and without the power to make such rules, adapted to accomplish the object of the statute, and give effectual relief to the parties interested in the sum for which these respondents are liable as damages for this collision.

The conclusion is, that the court has no power to grant the relief asked for on this motion, or under any form of proceeding that could be instituted. The evidence offered is therefore rejected, and the motion denied. And as it is conceded that the value of the City of Norwich and her pending freight, at the time of the collision, was much greater than the damages assessed in this case, a

decree must be entered for the libellants for the sum fixed by the court on confirming the commissioner's report.

[The decree of the district court was affirmed by the circuit court, Case No. 18,087, and the decree of the latter court was affirmed by the supreme court in 13 Wall. (80 U. S.) 104. For other cases growing out of the same collision, and involving some of the same questions, see Cases Nos. 11,202 and 2,760–2,762.]